UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MOHAMAD BAZZI,

*Plaintiff*,

*v*. CASE NO. 14-11205

CAROLYN W. COLVIN
Commissioner of Social Security,

DISTRICT JUDGE AVERN COHN
MAGISTRATE JUDGE PATRICIA T. MORRIS

*Defendant*.
_____________________________/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II. REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for Supplemental Security Income ("SSI")

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI, 42 U.S.C. § 1381 *et seq.*, and for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 18.)

Plaintiff Mohamad Bazzi first applied for DIB and SSI on January 7, 2010. (Tr. at 191-96.) The Commissioner denied those claims on April 7, 2010. (Tr. at 78-79.) On the same day his first claims were rejected, he reapplied for both DIB and SSI. (Tr. at 197-205.) These were denied on August 8, 2011.[2] (Tr. at 103-04.) Plaintiff filed his present applications on January 18, 2012, alleging that he became disabled at age thirty-five on February 9, 2008. (Tr. at 206-13.) At the initial administrative stage, the Commissioner considered unspecified arthropathies, denying Plaintiff's claims on February 7, 2013. (Tr. at 119-120.)

Administrative Law Judge ("ALJ") David F. Neumann convened a hearing on April 9, 2013. (Tr. at 38-77.) The ALJ issued a written decision on June 5, 2013, he issued a written decision denying Plaintiff's claims, which became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on February 5, 2014, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On March 22, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

---

[2] The Administrative Law Judge reviewing Plaintiff's current claims declined to reopen the previous applications under 20 C.F.R. §§ 404.988, 416.1488. (Tr. at 16.) The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977) (holding that Commissioner's decision not to reopen is unreviewable). A decision not to reopen does not meet those requirements.

**B. Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind

might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

**C. Governing Law**

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II

benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date, despite working a few months in 2011. (Tr. at 19.) The ALJ also found that he met the insured status through June 30, 2014. (*Id.*) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "status-post ACL reconstruction of the right knee; spondylosis of the lumbar spine; generalized anxiety disorder; and major depressive disorder." (Tr. at 20.) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 20-22.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform a limited range of sedentary work. (Tr. at 22-28.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr.

at 29.) At step five, the ALJ found that a significant number of jobs existed suitable to Plaintiff's limitations. (Tr. 29-30.)

**E. Administrative Record**

**1. Medical Records**

Plaintiff developed pain and swelling in his right knee in February 2008 after he twisted it exiting his truck. (Tr. at 332, 347.) An MRI that month showed a "tear in the midsubstance and posterior horn of the medial meniscus, with associated meniscal cyst formation." (Tr. at 334-35.) Plaintiff's joints had swollen, perhaps in reaction to the tear. (*Id.*) The pain continued into the next month, causing difficulties walking. (Tr. at 336.) Dr. Jiab Suleiman examined Plaintiff in March, noting difficulty walking but "good" range of motion. (Tr. at 347-48.) In April, with diagnoses of a torn meniscus and right knee derangement, Plaintiff underwent an arthroscopic partial medial and lateral meniscectomy. (Tr. at 349, 711-12.) Coming out of surgery, the diagnoses included partial tears of the medial and lateral menisci and minor synovitis. (*Id.*) The swelling and pain continued throughout the month. (Tr. at 338.)

By June, he was "60-70% improved" according to the surgeon, despite some ongoing pain. (Tr. at 351.) The swelling, but not the pain, had decreased by July, and all objective measures were normal–i.e., normal gait, "good" range of motion, and intact coordination. (Tr. at 352.) Treatment notes from the surgeon over the next few months remained similar, and despite continued normal examination findings, tests showed meniscal degeneration. (Tr. at 353-59.) An August MRI showed a possible cyst and tear in his knee. (Tr. at 717-18.) Dr. Suleiman ordered physical therapy, which Plaintiff participated in intermittently throughout the record, stopping when pain prevented the activities. (Tr. at 366, 420-47, 449-76, 524-689.) He began the physical therapy treatment with

normal gait, (Tr. at 538), and notes toward the end of those sessions indicate decreased pain and muscle spasm, and increased strength and range of motion; Plaintiff continued to complain that the pain disrupted his daily activities, but was very satisfied with the therapy. (Tr. at 420-21, 429, 431-32, 438, 441.) He walked without any assistance, even when climbing stairs. (Tr. at 441.) Visits with Dr. Suleiman in 2010 after the therapy found pain and weakness but good range of motion and no sensory or motor deficits. (Tr. at 715-16.) He walked normally, without a cane, but in April 2010, Dr. Suleiman wrote, "We will keep him off work for now." (Tr. at 715.) Nonetheless, he was alert and oriented during the session. (*Id.*)

Various diagnostic testing confirmed Plaintiff's ongoing issues. (Tr. at 325.) Eventually, Dr. Suleiman decided Plaintiff needed a second surgery and, in January 2009 he performed an arthroscopic meniscectomy for the "chronic" knee tear. (Tr. at 706-07.) After the procedure, Plaintiff's gait and range of motion was generally normal, though his pain persisted and test results showed tears. (Tr. at 326, 360-66.) Despite the mostly normal MRI results, Dr. Elie G. Khoury operated on Plaintiff's knee in December 2011, again for the meniscus tear. (Tr. at 402-17.) Afterwards, the physician thought his knee appeared stable; Plaintiff walked without support. (Tr. at 418.) He continued to treat with Dr. Khoury into 2012, (Tr. at 478-85), displaying good progress, normal strength and stability, and even "excellent" range of motion at times. (Tr. at 478, 481-83.) Nonetheless, he continued to complain of knee and back pain. (Tr. at 488-89, 520-21.) MRIs and x-rays from 2013 showed possible ligament and meniscal tears in his knee, and disc herniation and spinal stenosis in his back. (Tr. at 488, 491-93, 499-500, 502-04.) Also, a spirometry test in December 2011 was normal. (Tr. at 695.)

Plaintiff also underwent a variety of physical examinations for his disability claim. In March 2010, Dr. Cynthia Shelby-Lane conducted a consultative physical examination for the state agency distributing benefits. (Tr. at 367-74.) Both knees now hurt, impeding his daily activities and likely requiring future procedures. (Tr. at 367.) Plaintiff informed her that he suffered depression since his injury. (Tr. at 368.) He denied memory problems and most other physical issues. (Tr. at 368-69.) His schooling went to the seventh grade. (Tr. at 368.) The physical examination found largely normal results, noting that he limped but did not need a cane. (Tr. at 369-70, 374.) She assessed bilateral knee pain and stated he "would have difficulty with standing, stooping, squatting, lifting, bending, pushing, and pulling." (Tr. at 370.) The next month, Dr. William Joh completed a residual functioning assessment, finding Plaintiff could lift up to twenty pounds, sit and stand for six hours each, and complete various other physical tasks. (Tr. at 378-84.)

In June 2011, Dr. Leonidas Rojas examined Plaintiff, who continued to complain of knee pain. (Tr. at 385.) Plaintiff stated he had been "depressed for several years and has noted impairment of his remote and short[-]term memory. He does not see a psychiatrist and does not take antidepressants." (Tr. at 385.) He also mentioned that he lived in Lebanon until he was fourteen and that he finished high school. (*Id.*) He lived with his wife and four children; he could drive and take care of personal needs. (*Id.*) Plaintiff's "[t]hought content and association [were] grossly normal but his mood [was] flat." (Tr. at 386.) Along with the meniscal tear in his right knee, evidenced by difficulties walking, Dr. Rojas assessed chronic depression. (*Id.*)

Plaintiff consulted with Dr. Ihab Deebajah on November 21, 2011, regarding his sleeping difficulties. (Tr. at 396-97.) Typically, Plaintiff slept five hours each night, waking three times. (Tr. at 396.) He napped during the day, but still felt sluggish. (*Id.*) He smoked two packs of cigarettes

daily. (*Id.*) The physical examination was unremarkable; Plaintiff had normal muscle strength and normal "[m]ood and affect . . . without evidence of depression, anxiety or agitation." (Tr. at 397.) Dr. Deebajah diagnosed sleep apnea syndrome and scheduled a sleep study. (*Id.*) The results of that study came back in December, showing only mild sleep apnea. (Tr. at 398.) At follow-up appointments with Dr. Deebajah in 2011 and 2012, Plaintiff's physical examinations were again normal, without any sign of depression or anxiety. (Tr. at 400, 691-92, 696-99.) In January 2012, Plaintiff complained of "excessive daytime sleepiness," (Tr. at 696, 698), but he said his activity level was "good," (Tr. at 698), and during his next visit the following month, denied fatigue. (Tr. at 691, 693.) Finally, in March 2013, he consulted with Dr. Paul Mazaris regarding his back pain. (Tr. at 520-21.) Diagnostic results showed mild disc degeneration, while Plaintiff's strength and gait were normal during the physical examination. (Tr. at 521.) The report also states, opaquely, "PHQ9 Depression Screening: 21." (*Id.*) This apparently indicated severe depression. (Doc. 13 at 12.)

Pertinent to Plaintiff's present claims, which center on the ALJ's mental health findings rather than his physical issues, (Doc. 13 at 14-24; Doc. 14 at 2 n.1), Dr. Suleiman's notes frequently found that Plaintiff's "affect" was normal. (Tr. at 352-55, 357.) In June 2011, Plaintiff saw Dr. Terrance Mills for a consultative mental examination. (Tr. at 392-94.) Plaintiff alleged disability due to poor memory and anxiety. (Tr. at 392.) The problems developed after an automobile accident three years prior, though Plaintiff "never hit his head or was unconscious." (*Id.*) Nonetheless, he became forgetful after the accident, needing reminders to take medications and even failing to recall things he just said. (*Id.*) Sleep did not come easily, sometimes taking until the early morning hours. (*Id.*) Frustrated and feeling "useless," he spent his days watching

television; he no longer had the patience to read. (*Id.*) He enjoyed being around others, "but now doesn't want to bother with them," Dr. Mills wrote, and he claimed to not have any friends. (*Id.*) Plaintiff did not take medication for his mental problems. (*Id.*)

He told Dr. Mills that he arrived in the United States from Lebanon when he was twenty-five, and never went to high school. (*Id.*) His wife sometimes helped with his personal care, particularly showering, shaving, and dressing, because he could not stand long enough. (Tr. at 393.) Dr. Mills observed that Plaintiff's wife brought him to the appointment; he was "neatly dressed and groomed," and used a cane, displaying slow motor activity due to his physical problems. (*Id.*) His self-esteem was poor, but "[h]is speech was spontaneous for the most part. He was logical and organized." (*Id.*) He denied having hallucinations, delusions, persecutions, suicidal ideations, and obsessions. (*Id.*) He had trouble "sitting still" and often grew "irritable out of frustration." (*Id.*) Dr. Mills noted Plaintiff's depressed and anxious mood, observing he was primarily frustrated with his knee pain. (*Id.*) His memory problems were also "primarily due to depression, pain and anxiety." (Tr. at 394.) The diagnosis included moderate depression, anxiety, and a Global Assessment of Functioning score of fifty to fifty-five, indicating moderate difficulties in occupational or social functioning. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).[3] Dr. Mills added, "He is not able to do work related activities in part due to his depression and anxiety." (Tr. at 394.)

In July 2011, Dr. Dyan Hamptom-Aytch, a psychologist, reviewed the medical record to assess Plaintiff's mental impairments. (Tr. at 84-89, 95-100.) Dr. Hamptom-Aytch considered and

---

[3] The most recent edition of this text, however, rejects the use of GAF scores. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013).

rejected various mental impairment listings, finding that Plaintiff did not meet or equal them. (Tr. at 84-85, 95-96.) Instead, Plaintiff had only mild restrictions in his daily life and social functions, and moderate restrictions maintaining concentration and pace. (Tr. at 85, 96.) Dr. Hampton-Aytch explained that Plaintiff lacked any treatment history and that the consultative examiner found him oriented and organized, without hallucinations or delusions. (Tr. at 85, 89, 96, 100. ) His daily activities also indicated a higher functioning level. (*Id.*) As a result, he gave Plaintiff's assertions little weight, and decided simple work would not be precluded. (*Id.*) Specifically, he had no significant limitations in the following: remembering work procedures; understanding short and simple instructions; sustaining regular work routine; work next to others without distraction; simple decision-making; and completing a normal workweek without interruptions. (Tr. at 88-89.) He had no social interaction or adaptation limitations. (Tr. at 89.) He had moderate limitations understanding detailed instructions, carrying out those instructions, and maintaining concentration for extended periods. (Tr. at 88-89.)

Plaintiff was examined by Dr. Firoza Van Horn, a psychologist, February 6, 2013. (Tr. at 512-17.) When he was three and living in Lebanon, his mother died and his father deserted him. (Tr. at 512.) As a child, he witnessed wartime atrocities, hid in shelters from bombs, dealt with food scarcity, saw mutilated bodies and maimed individuals, and had friends who were killed. (*Id.*) Plaintiff said he came to the United States when he was thirteen. (*Id.*) In the tenth grade, Plaintiff dropped out of school. (*Id.*)

Plaintiff told Dr. Van Horn that he felt depressed and useless. (Tr. at 513.) Apparently, he believed that "since he was injured, the pain triggered the trauma [he suffered as a child] and as a result he cannot sleep at night." (*Id.*) He also had flashbacks and was "sensitive to noise." (*Id.*)

Despite his problems, he never sought psychiatric hospitalization, therapeutic counseling, or psychotropic medication. (*Id.*) Plaintiff sat "on the couch all day and . . . [had] no energy to do anything," even "pleasurable activities." (*Id.*) Apparently, he had stopped watching television. (Tr. at 515.) He had no friends and drove only short distances. (*Id.*) Physically, Plaintiff appeared well-groomed and walked normally without a cane. (Tr. at 513.)

Dr. Van Horn thought Plaintiff "remained distant and emotionally detached. . . . [and] was visibly depressed." (Tr. at 514.) Also, he seemed "not very alert to his environment," for example, remaining unaware of the exact date. (*Id.*) During the memory test, he could not recall the names of three objects after a three minute delay and his "ability to recall autobiographical events from both recent and . . . [the] remote past was poor." (*Id.*) The names and dosages of his medications also escaped his memory. (*Id.*) He needed reminders to shower and take his prescriptions. (*Id.*) His ability to concentrate was also poor. (*Id.*) His thought process was logical and did not stray off topic, nor did he show confusion or become distracted by "internal or external stimuli." (*Id.*) He spoke softly, but coherently. (*Id.*) Apparently, he was "too depressed to think," though his "fund of general knowledge was commensurate with his education background." (Tr. at 515.) His judgment, however, was not on par with his "intellectual level." (*Id.*) As evidence, Dr. Van Horn offered Plaintiff's responses to three questions: he would do "nothing" if he found a stamped, addressed envelope in the street; he would "run away" if he was in a movie theater that caught fire; and he replied that he did not go into forests when asked what he would do if lost in a forest during the daytime. (*Id.*) Throughout the interview, Plaintiff's affect was sad and depressed. (*Id.*)

Dr. Van Horn concluded that Plaintiff functioned at the borderline range of intelligence. (Tr. at 515-16.) She diagnosed depression and post traumatic stress disorder ("PTSD"). (Tr. at 516.)

Further, he had marked limitations in relating to co-workers and supervisors; remembering and carrying out simple tasks; and maintaining attention, concentration, persistence, and pace in routine tasks. (*Id.*) He could not handle daily stresses in a work setting. (*Id.*) Her prognosis was thus guarded. (Tr. at 517.) Explaining her conclusions, she stated,

> His world started with trauma that became imprinted in his memory and when he became injured at his place of employment, the pain and the loss of his independence caused the hidden memories to surface and as a result, he feels totally overwhelmed, helpless and hopeless. He has no energy to fight anymore.

(Tr. at 516.)

The next month, Dr. Van Horn answered a mental RFC questionnaire. (Tr. at 508-11.) Under the line, "Treatment and response," she wrote, "weakly [sic] psychotherapy-neurofeedback." (Tr. at 511.) Plaintiff's medications included Vicodin and Motrin, neither of which had side effects. (*Id.*) The clinical findings supporting her assertions came from the recent session: he was emotionally detached, visibly depressed, could not "do anything for himself," he was not alert to his surroundings or oriented to the "date, month [and] year," he had memory problems, confusion, and poor judgment and concentration. (*Id.*) His prognosis was "[p]oor because he [had] long[-]term emotional problems." (*Id.*) The next page listed various symptoms the psychologist could check off if Plaintiff had exhibited them. (Tr. at 509.) Dr. Van Horn selected nearly every symptom. (*Id.*) Among the more surprising were: suicidal thoughts; feelings of guilt; appetite disturbances accompanied by weight changes; impulsiveness, "[p]sychomotor agitation or retardation"; pathological dependence, nonorganic disturbances in his vision, speech, hearing, limb use, movement, or sensation; personality changes; paranoia; incoherence; psychological or behavioral abnormalities "associated with a dysfunction of the brain with a specific organic factor judged to be etiologically related to the abnormal mental state"; persistent irrational fears; "[i]ntense and

unstable interpersonal relationships and impulsive and damaging behavior"; disorientation; perceptual and cognitive disturbances; and a "history of multiple physical symptoms (for which there are no organic findings) of several years duration beginning before age 30" that caused him to take medications frequently. (*Id.*)

The next page and a half rated the limitations in various vocational abilities. (Tr. at 510-11.) Of the mental abilities necessary to do unskilled work, Dr. Van Horn concluded that Plaintiff was unable to satisfactorily perform–but was not "precluded in all circumstances" from doing–most of the necessary tasks. (Tr. at 510.) This rating, labeled "Seriously limited," is likely less severe than it sounds, as it came right in the middle of a spectrum of five ratings, ranging from unlimited limitations to "No useful ability to function." (*Id.*) For example, he would struggle remembering work procedures and instructions, carrying out even simple instruction, working with others, and noticing normal hazards. (*Id.*) Plaintiff would have lesser restrictions in maintaining regular attendance and performing at a consistent pace without "unreasonable" rest periods. (*Id.*) For skilled work, he would have "[l]imited but satisfactory" ability to understand and remember detailed instructions and carry out those instructions. (*Id.*) This rating was the second least severe of the five. (*Id.*) He had serious limitations–the middle rating–in setting realistic goals and dealing with "areas of semiskilled and skilled work." (*Id.*) He maintained that rating for many other general vocational skills, including dealing with the public, displaying socially appropriate behavior, staying neat and clean, traveling, and using public transportation. (Tr. at 511.) Finally, Dr. Van Horn asserted Plaintiff had a "low IQ or reduced intellectual functioning" because he had only ten years of "education." (*Id.*)

**2. Application Forms and Administrative Hearing**

Plaintiff's wife filled out two Function Reports on Plaintiff's behalf. (Tr. at 252-59, 296-303.) The first, in February 2010, began with his daily activities. (Tr. at 252.) He went to physical therapy in the morning, returning home to read and watch television until his children returned from school. (*Id.*) He helped with their homework, at dinner, which his wife cooked, then watched television and played video games until going to bed. (*Id.*) Perhaps mistakenly, he marked on the next page that he did not take care of any dependents, including children. (Tr. at 253.) He had trouble sleeping, but no difficulties with his personal care aside from occasional reminders to take his medications. (Tr. at 253-54.) He could not stand long enough to finish cooking; "That's why my wife does" the cooking, he added. (Tr. at 254.) With help and encouragement from others, he could do his laundry and iron clothes. (*Id.*) In the summers, he often enjoyed sitting on his porch. (Tr. at 255.) He could drive short distances, but he never shopped. (*Id.*) He could handle his finances. (*Id.*) Social interactions were difficult at times, and he found talking with others could become tiresome. (Tr. at 257.) He said that his impairments affected various physical abilities and also his memory. (*Id.*)

However, when given a list of capacities his impairments potentially affected, he did not select most of the mental capacities, such as concentration. (*Id.*) Further, he claimed that he finished things he started and had no problem following spoken instructions. (*Id.*) Yet, asked how well he got along with authority figures, he said he could follow directions for only an hour or two. (Tr. at 258.) He denied any "unusual behavior or fears," and did not need any assistive devices, including canes and braces. (Tr. at 258.) He left many answers blank; for example, whether he

could follow written instructions, pay attention, and adequately handle stress and changes in his routine. (Tr. at 257-58.)

The Function Report for his current application, again completed by his wife, mirrors his first. (Tr. at 296-303.) Asked how his impairments affected his ability to work, he stated he could not kneel, use the stairs, or walk more than a mile. (Tr. at 296.) He still had memory problems, so his wife wrote reminder notes for him. (Tr. at 297.) He sat at home all day, waiting for his wife to cook and to take him to doctor appointments. (Tr. at 298.) His ability to handle personal care had decreased; he now needed help putting on pants and showering, and he could no longer drive or manage his finances. (Tr. at 299-300.) His daily activities also decreased; while he stated in the first Report that he played video games and enjoyed reading, he now said, "I don't know how to use [the] computer. I don't know how to read." (Tr. at 300.) He did not spend time with others. (Tr. at 300.) His list of limitations remained the same; his only mental issues were memory problems. (Tr. at 301.) However, now he could not finish projects, pay attention for over ten minutes, get along with authorities, and it seems he meant to write that he could not follow written or spoken instructions–the handwriting is difficult to decipher. (Tr. at 301-02.) He still had no unusual behaviors or fears. (Tr. at 302.) Medications included Motrin and Vicodin. (Tr. at 303.)

His wife also filled out a Third-Party Function Report in 2011 describing Plaintiff's impairments from her perspective. (Tr. at 270-77.) Asked how his illnesses affected work, she said he could not work because he struggled to walk. (Tr. at 270.) During a normal day, she prepared his coffee in the morning, got his shower ready, then he would read and watch television. (Tr. at 271.) He did not take care of any dependents and struggled to maintain personal care, such as dressing. (*Id.*) He had memory problems and needed nudges to take his medicine. (Tr. at 272.) She

drove when he needed to go out, but sometimes he could travel alone. (*Id.*) He struggled with the computer because he had difficulty reading English. (Tr. at 273.) Poor memory made handling money difficult. (*Id.*) She observed that he spent time with others, generally only short phone conversations because he did not enjoy social settings, which caused him to grow anxious and looking for an early exit. (Tr. at 274.) His only regular social events were with his family. (*Id.*) She included more limitations than in the previous forms, stating he also had limitations in following instructions, using his hands, and getting along with others. (Tr. at 275.) He could maintain his attention for five to ten minutes and did not follow written or spoken instructions. (Tr. at 275-76.) Like Plaintiff, she did not think he had any unusual fears or behavior. (Tr. at 276.) He used crutches and a knee brace. (*Id.*)

At the administrative hearing on April 9, 2013, Plaintiff testified that he had four children, all under the age of fourteen. (Tr. at 43.) The ALJ observed Plaintiff had a cane and asked who prescribed it. (Tr. at 44.) Dr. Suleiman did, Plaintiff responded, about four or five years ago. (*Id.*) Plaintiff dropped out of school after the seventh grade and never obtained a GED or high school diploma. (*Id.*) The ALJ noted that there were many different stories about his schooling in the record; Plaintiff's representative suggested that the difficulty came because he grew up in Lebanon. (Tr. at 45.) The ALJ then asked if he ever passed the test for his driver's license; Plaintiff said he had. (*Id.*)

Next, the ALJ noted that the amended disability onset date was June 28, 2011. (Tr. at 46.) Plaintiff then discussed his knee surgeries and ongoing physical pain. (Tr. at 46-49.) He could not remember whether he had any ongoing treatment for his mental conditions. (Tr. at 49.) Nonetheless, he testified that he followed his doctors' advice. (Tr. at 50-51.) Switching to his work

history, Plaintiff testified he had not worked in five years. (Tr. at 51.) If that were so, how could he explain the $7203 in earnings from 2011, the ALJ asked. (Tr. at 51, 215.) Plaintiff thought the earnings had something to do with losing his house to foreclosure and receiving "some money back from the bank"; in any case, he did not work for it. (Tr. at 51-52.) Pressed further, Plaintiff suggested it was his wife's income. (Tr. at 52-53.) This did not satisfy the ALJ. (*Id.*) He pointed to another tax record showing $7800 in non-employee compensation that year in his wife's name. (Tr. at 52, 234.) The attorney posited that the lower figure could be from the same source, less expense deductions. (Tr. at 53.)

Plaintiff then testified that he took Motrin and Vicodin. (Tr. at 53-54.) Plaintiff did not know how long he could sit, but he estimated he could stand for about a half hour. (Tr. at 54.) He had not tried to lift, carry, push, or pull anything, so he did not know how much weight he could manage at those tasks. (Tr. at 54-55.) He could only sometimes bend, but never kneel or squat. (Tr. at 55.) The ALJ then asked how long Plaintiff stood in the line to enter the court that morning before his hearing. (Tr. at 55.) At first he could not remember, but then he recalled it was about a five to ten minute wait. (Tr. at 55-56.)

On a normal day, Plaintiff went to bed at 1:00 a.m. and woke five hours later. (Tr. at 56.) He napped for a few hours almost every day. (Tr. at 56-57.) It took him a few minutes in the morning before he could get up. (Tr. at 57.) He had only shopped a few times since 2011; generally his wife went to the store for him. (Tr. at 57-58.) He had a driver's license however, and could drive for fifteen minutes at most before needing to stop. (Tr. at 58.) He did not cook, clean, take out the trash, or take care of their cat. (Tr. at 59.) While watching television, he sat, stood, then lied down. (*Id.*) He could not use their home computer but did read for about one hour a day, in Arabic

rather than English, which was also the language used in his driver's license test. (Tr. at 60, 68-69.) Again, while reading he sat and stood. (*Id.*) Plaintiff did not attend conferences with his children's teachers or help them with their homework; he would "watch them doing stuff," however. (Tr. at 61.) He spent most of the day alone in his basement. (Tr. at 63-64.)

Plaintiff's attorney then asked if he had ever seen a counselor. (Tr. at 62.) Yes, he replied, he had seen a psychologist because his wife said he was "acting weird" and thought counseling would help. (*Id.*) The problems leading to counseling came from the emotional fallout of his diminishing physical capacities and his frequent brooding over traumatic childhood memories. (Tr. at 63.) His inability to be a more active parent also caused consternation. (Tr. at 65.) His mental issues prevented him from helping around the house. (Tr. at 66.)

The ALJ then asked the vocational expert ("VE") to

> assume an individual of the Claimant's age, education, and past work experience who would require work which is simple, routine, repetitive work at a [Specific Vocational Preparation level] of one or two, who could only lift or carry 10 pounds frequently and 15 pounds occasionally, who could stand or walk with normal breaks for a total of one hour in an eight hour workday, who could sit with normal breaks for a total of seven hours in an eight hour workday, who should avoid frequent ascending and descending stairs, who could perform pushing and pulling motions with their upper and lower extremities within those weight restrictions, who could perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching, who could perform each of the following postural activities occasionally: climbing ramps and stairs, balancing, stooping, kneeling, crouching, or crawling, who would need to have the use of a cane for ambulation, but the contra lateral upper extremity could be used to lift and carry up to the exertional limits specified, and no squatting.[4]

[4] A Specific Vocation Preparation level of one or two indicates that he could perform jobs that require one month or less to learn. *See* Soc. Sec. Admin., *Program Operations Manual System* DI 250001.001(B)(79), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#b78.

(Tr. at 71.) That person could not perform Plaintiff's past work, the VE testified. (*Id.*) However, at the sedentary exertional level, Plaintiff could perform various jobs: sports equipment assembler, (1500 positions in southeast Michigan); optical inspector, (2000 positions in southeast Michigan); and pharmaceutical packer, (2000 positions in southeast Michigan). (Tr. at 72.) Adding a "sit/stand" option would reduce the number of jobs in each position–down to 750 for the assembler, 1000 for the inspector, and 1200 for the packer–but not preclude that work altogether. (Tr. at 73.) If that same person was off task two hours out of eight, or twenty-five percent of the time, he could not maintain any of those positions. (Tr. at 73-74.) Nor could he keep his jobs if he missed work four times each month. (Tr. at 74.)

Plaintiff's representative ended by noting that Dr. Van Horn "indicates that she's seeing [Plaintiff]" but had not provided any of her records. (*Id.*) Thus, the ALJ might not yet be in a position to adequately review her opinion. (Tr. at 74-75.) Also, the representative reiterated that the post-onset income in 2011 was from the home foreclosure, "Somehow the accountant made that self-employment [income] but it has to do with their home." (Tr. at 76.)

**F. Analysis and Conclusions**

**1. Legal Standards**

The ALJ determined that Plaintiff had the RFC to

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is able to lift or carry 10 pounds frequently and 15 pounds occasionally (from very little, up to ½ of an 8-hour workday[)]. The claimant can stand and/or walk (with normal breaks) for a total of one hour in an 8-hour workday and sit (with normal breaks) for a total of seven hours in an 8-hour workday. The claimant should avoid frequent ascending and descending of stairs. The claimant can perform pushing and pulling motions with his upper and lower extremities within the aforementioned weight restrictions. The claimant can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. The claimant is unable to squat. The claimant can perform activities requiring bilateral manual dexterity for

> both gross and fine manipulation with handling and reaching. The claimant requires use of a cane for ambulation, but the contralateral [sic] upper extremity can be used to lift and carry up to exertional limits specified. The claimant is limited to work that is simple, routine, and repetitive work at [a Specific Vocational Preparation level] of 1 or 2 as defined by the Dictionary of Occupational Titles.

(Tr. at 22.) Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

**2. Substantial Evidence**

**a. Plaintiff's Argument**

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff's argument attacks the ALJ's analysis of his mental impairments. (Doc. 13 at 14-24.) First, the ALJ's rejection of Dr. Van Horn's and Dr. Mills's opinions was an error. (*Id.* at 15.) The ALJ explained that the opinions were internally inconsistent, lacked clinical support, and came after a single examination each. (*Id.* (citing (Tr. at 27)).) Regardless that they were the product of

a single examination, Plaintiff protests they were the only psychological evaluations in the record. (*Id.*) Further, Dr. Van Horn provided a thorough narrative report bolstering her conclusions. (*Id.* at 15-16.) The alleged inconsistency in her report is not an inconsistency at all. The ALJ noted that she found he had marked limitations in carrying out simple tasks but a satisfactory ability to understand and carry out detailed instructions. (*Id.* at 16 (citing (Tr. at 27, 510)).) These are "different skill sets," Plaintiff claims, and in any case this lone inconsistency does not justify throwing out the entire opinion. (*Id.*) He also rejects the ALJ's assertion that other physicians' findings clashed with Dr. Van Horn's, noting that Dr. Rojas assessed depression, Plaintiff professed depression on Dr. Mazaris's intake form, and the other physicians focused on his physical problems, not mental issues. (*Id.* at 16-17.)

The ALJ's analysis of Dr. Mills's opinion was likewise ill-founded according to Plaintiff. (*Id.* at 17.) The opinion was consistent with Dr. Van Horn's. (*Id.*) Also, by stating Plaintiff could not complete work activities, it indicated Plaintiff was disabled. (*Id.* at 17-18.) Finally, "It is unclear how the ALJ's functional capacity finding is more supported, in comparison to the assessment of a trained psychologist." (*Id.* at 17.)

Plaintiff then pinpoints how these errors skewed the RFC; specifically, the ALJ's conclusion that Plaintiff could perform "'simple, routine, repetitive work.'" (*Id.* at 18 (quoting (Tr. at 22.)).) He admits that moderate limitations in concentration, persistence, and pace do not "'necessarily preclude simple, routine, unskilled work.'" (*Id.* (quoting *Harrell v. Colvin*, No. 13-11161, 2014 WL 3845930, at *5 (E.D. Mich. Aug. 5, 2014)).) Nonetheless, the ALJ erred because none of the evidence here implied his limitations were moderate or otherwise showed Plaintiff could perform such work. (*Id.* at 19.) The ALJ thus substituted his lay interpretation for the

medical sources' opinions. (*Id.*) Dr. Van Horn, for example, "opined that Plaintiff was 'markedly impaired' in his ability to relate to others, . . . to understand, remember, and carry out simple tasks," and "to maintain attention, concentration, persistence and pace . . . ." (*Id.* at 20.) Also, Dr. Mills thought he would struggle relating to supervisors and co-workers. (*Id.* (citing (Tr. at 510, 516)).) Limiting Plaintiff to "simple, routine, repetitive work does not address these significant limitations," Plaintiff concludes. (*Id.*)

Finally, he attacks the ALJ's credibility opinion, again focusing on the mental impairments. (*Id.* at 21-24.) Plaintiff's failure to seek mental health treatment is not a sound rationale because case law suggests that such failure may be a result of those impairments. (*Id.* at 21-22.) Moreover, both Dr. Van Horn and Dr. Mills thought Plaintiff needed treatment. (*Id.* at 22.) The ALJ also ignored Plaintiff's post-traumatic stress disorder diagnosis. (*Id.* at 23.) His reliance on Plaintiff's daily activities and his own observations at the hearing was also flawed. (*Id.* at 23-24.)

Defendant disagrees. (Doc. 14 at 7-16.) She notes the various observations from doctors that Plaintiff's mood was normal did not display depression. (*Id.* at 7-8.) Further, Defendant contends that Dr. Van Horn's opinion was inconsistent. (*Id.* at 8.) "It is difficult to see how" a serious limitation in carrying out simple instructions but a satisfactory ability to carry out detailed instructions is not "*per se* inconsistent": "they describe the exact same skill, just executed at two different levels, and . . . the common sense understanding of the adjective "detailed" means that it is more complex or harder than a simple version of the same task." (*Id.*) In fact, Dr. Van Horn's opinion rated Plaintiff's abilities at the semi-skilled work level higher than his abilities at the unskilled work level. (*Id.* at 9.) Yet, semi-skilled work is "'more complex than unskilled work'" according to the regulations. (*Id.* (quoting 20 C.F.R. § 404.1568(b)).) Defendant points out other

inconsistencies in the opinions. (*Id.*) Additionally, the ALJ did not impermissibly supplant his lay opinion over experts'. (*Id.* at 10.) The ALJ cited Dr. Hampton-Aytch's analysis in support of his conclusions. (*Id.* at 10-11.) Further, Defendant pounces on Plaintiff's admission that moderate impairments can be accommodated by simple, routine work. (*Id.*) The ALJ also "expressly considered Plaintiff's PTSD in his discussion of Dr. Van Horn's opinion," further noting that a diagnosis, without more, does not indicate the severity of an impairment. (*Id.* at 12.)

Finally, the credibility assessment is generally within the ALJ's discretion. (*Id.* at 13.) There was sufficient evidence in the record that showed Plaintiff's normal mood, and the ALJ did not err by using that evidence to partially discredit Plaintiff's complaints. (*Id.*) Plaintiff's daily activities were also vigorous enough–helping his children with homework, for example–to question his subjective assertions. (*Id.* at 14.) The failure to seek treatment likewise supports the ALJ's findings. (*Id.*) In fact, in one of the cases Plaintiff cites that warns against relying on this evidence when addressing mental impairments, the Sixth Circuit found nonetheless that the ALJ properly used that lack of treatment where the claimant did not assert that his impairments prevented obtaining treatment. (*Id.* at 14-15 (citing *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004).) The ALJ also highlighted Plaintiff's string of inconsistent statements. (*Id.*)

Plaintiff's reply brief rehashes many of his previous arguments. (Doc. 15.) He adds a citation to SSR 85-15, 1985 WL 56857, at *6 (1985), to rebut the ALJ's charge that Dr. Van Horn's opinion was inconsistent; the Ruling states that mental impairments could make an unskilled job "objectively more demanding" than other work, depending on the nature of the limitations. (Doc. 15 at 3.) Further, the other inconsistencies Defendant raised are impermissible post hoc rationalizations under *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947). (*Id.*) He again

claims that his impairments caused "limitations beyond the need for 'simple, routine, repetitive work.'" (*Id.* at 5.) Also, Dr. Van Horn did not simply diagnose PTSD, but also described evidence from Plaintiff's history supporting that diagnosis and used it to explain the general limitations. (*Id.*)

He then attacks the ALJ's reliance on physician opinions regarding his mental impairments–an orthopedist's failure to observe depression should not overturn a consulting psychologist's opinion. (*Id.* at 6-7.) Moreover, the Commissioner was mistaken when he said Plaintiff went to his children's conferences and helped with homework–he only watched his "children in activities, but [did] not participate." (*Id.* at 7.) Plaintiff's failure to seek treatment could plausibly be related to his depression and PTSD. (*Id.* at 7-8.)

**b. Medical Source Evidence, Plaintiff's Credibility, and the RFC**

**i. Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The regulations do not prescribe any similar test for opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. Nonetheless, both the Sixth Circuit and the Commissioner require ALJ's to apply the factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §

404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[5] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to

[5] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

deference because it was based on Poe's subjective complaints, rather than objective medical data.").

When objective evidence does not support the opinion, the regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188, at *4 (1996) . *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007); *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).. Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5. *See also Rogers*, 486 F.3d at 242. "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility

assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i) [D]aily activities;

(ii) The location, duration, frequency, and intensity of . . . pain;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v) Treatment, other than medication, . . . received for relief of . . . pain;

(vi) Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she]

furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

**ii. Analysis**

Plaintiff's arguments lack merit. First, the ALJ properly noted that Dr. Mills and Dr. Van Horn only examined Plaintiff once. (Tr. at 25-27.) Plaintiff contends that the ALJ could not jettison the opinions simply because there was no treating psychologist or psychiatrist. (Doc. 15 at 2.) This observation is besides the point; the regulations require the ALJ to weigh medical opinions, in part, on the length of the relationship, the frequency of examination, and the "nature and extent of the . . . relationship." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). Here, the sources' limited relationship with Plaintiff was relevant to their persuasiveness. Accordingly, the fact that they were the only medical opinions on his mental impairments, and the ALJ questioned each, cuts

both ways. Contrary to Plaintiff's assertion that this could only mean the ALJ went against all the relevant evidence, it also shows that Plaintiff failed to proffer much support for his disability. Instead, he hinged his entire mental health disability claim on two examinations. Yet, he bears the evidentiary burden. 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5.; *Jones*, 336 F.3d at 474; *Her*, 203 F.3d at 391. Thus, the ALJ correctly cited the opinions' thin underpinnings.

He sufficiently addressed Dr. Mills's opinion. (Tr. at 25-26.) He correctly noted that Dr. Mills's most pertinent conclusion was "vague, ambiguous, and not well supported by the clinical findings . . . ." (Tr. at 26.) Indeed, it is not clear what Dr. Mills meant by his statement that Plaintiff "is not able to do work related activities in part due to his depression and anxiety." (Tr. at 394.) To the extent it relies on Plaintiff's physical problems, the opinion is outside his expertise. While it seems, almost certainly, to have meant Plaintiff could not work, it does not give useful information detailing the extent of discrete limitations. *Cf.* Soc. Sec. Admin., *Program Operations Manual System* DI 24510.065, *available at* https://secure.ssa.gov/poms.nsf/lnx /0424510090 (noting that even labels such as "moderate" are unhelpful in formulating an RFC because they "do not usefully convey the extent of capacity limitation"). A host of various abilities comprise a claimant's capacity to work; for example, those shown on Dr. Van Horn's checklist opinion. (Tr. at 510.) Dr. Mills's did not delve into these more helpful descriptions, thus impeding the ALJ's ability to translate the opinion into an RFC assessment. Moreover, Dr. Mills only assessed moderate depression and found his speech was spontaneous, logical, and organized. (Tr. at 393.) Without medical expertise, an ALJ should not be quick to read these observations as blatant contradictions of a medical source's opinion that a claimant is disabled. Nonetheless, combined with Dr. Mills's undeveloped findings, they give some support to the ALJ's conclusions.

The ALJ also properly highlighted the tensions in Dr. Van Horn's opinion. (Tr. at 26-27.) Plaintiff is correct when pointing out that mental impairments could affect different skill levels in different degrees. (Doc. 15 at 3.) But that is not the import of Dr. Van Horn's opinion. Instead, her opinion contains facial inconsistencies that she never explains; the inconsistencies appear on a preprinted form in which she merely checked-off answers. (Tr. at 510-11.) The form asked the same question at two different levels: what was his limitation in understanding, remembering, and carrying out "short and simple instructions" and what was his limitation in understanding, remembering, and carrying out "detailed" instructions. (Tr. at 510.) She concluded that he would have more difficulty with simple than detailed instructions. (*Id.*) Perhaps her medical expertise provided some ground for this surprising conclusion. It is difficult to imagine what that could be. While ALJs and courts should give some deference to medical experts, *see, e.g.*, 20 C.F.R. § 404.1527, at some point they cannot simply write off all questionable medical opinions as the result of inscrutable expertise rather than flawed reasoning. Thus, for example, the ALJ must measure the consistency of the opinions with other evidence. *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). Dr. Van Horn's opinion was inconsistent and, even if complex medical explanations could untangle that inconsistency, she offered none. Plaintiff roots around in Dr. Van Horn's notes and an administrative ruling to develop an explanation; but not only was that explanation not before the ALJ, it is based largely on Plaintiff's attorney's medical expertise, which is owed no deference, rather than Dr. Van Horn's.

Plaintiff's throwaway *Chenery* claim also fails to persuade. (Doc. 15 at 3.) The Defendant notes various inconsistencies in Dr. Van Horn's opinion. (Doc. 14 at 8-10.) Plaintiff complains that this is a post hoc rationalization because the ALJ did not cite this same evidence. (Doc. 15 at 3.)

True, the government as a litigant cannot provide, and the court cannot develop or accept, after-the-fact rationalizations for the agency decision "that the agency had not relied on in its [disputed] decision . . . ." *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010). *See also Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing *Chenery* and holding, "But these are not reasons that appear in the ALJ's opinion, and thus they cannot be used here"); *see also Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir. 1993) (unpublished decision) ("[I]n large part, an agency's decision must be affirmed on the grounds noted in the decision."). Nonetheless, the court can consider "any evidence in the record, regardless of whether it has been cited by the ALJ" or the Appeals Council. *Blackburn*, 2012 WL 6764068, at *4; *see also Heston*, 245 F.3d at 535 ("Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."). The gravamen of the analysis is whether the Defendant or court develops new arguments, not whether they cite evidence to support the ALJ's arguments.

If Defendant's analysis strays at all from the ALJ's decision, it does no more than simply plug a few additional pieces of evidence into the ALJ's explanations. That is, Defendant does not develop any new arguments, but simply adds evidence to the grounds the ALJ cited in his decision. In fact, its questionable whether Defendant even cites any new evidence: when discussing the inconsistencies, both Defendant and the ALJ mention Plaintiff's goal-oriented and logical thoughts and his lack of confusion, among other findings. (Tr. at 26-27); (Doc. 15 at 9-10.)

This adequately addressed the opinion's inconsistencies and groundlessness. If anything, it left out a few glaring gaps. First, Plaintiff props up Dr. Van Horn's opinion on PTSD by noting that she explained how his recent injury had triggered the childhood memories. (Doc. 15 at 8

(citing (Tr. at 508, 516).) This nuanced piece of psychoanalysis does not appear to have originated with Dr. Van Horn–Plaintiff posited it to Dr. Van Horn during the session. (Tr. at 513.) At most, then, she adopted his insights. Yet, ALJs are not required to credit the portions of a doctor's notes that merely contain the Plaintiff's subjective complaints. *Masters*, 818 F. Supp. 2d at 1067; *see also Francis*, 414 F. App'x at 804; *Poe*, 342 F. App'x at 156. It would seem that the same reasoning should apply with at least as much force when the notes contain Plaintiff's own medical opinions; although the fact that Dr. Van Horn appears to have concurred gives it added credibility.

In any case, her checklist opinion contains a few extraordinary assertions. In it, she said he had psychomotor "agitation or retardation." (Tr. at 509.) Her session notes, however, suggest that far from any difficulties he was physically normal: he had good hygiene, walked normally without a cane, his posture was "within normal limits," and his "vision and hearing [were] fine." (Tr. at 513.) His retardation must have been apparent only because he seemed lethargic and "hardly moved from his chair." (Tr. at 515.) Next, according to the checklist, he had pathological dependence and nonorganic disturbances in his vision, speech, hearing, limb use, movement, or sensation. (Tr. at 509.) Again, this conclusion could only spring from his lack of movement; she noted his normal vision and hearing, "soft but coherent" speech, and lack of mental illnesses or irrational beliefs. (Tr. at 513-15.)

Likewise lacking support was her checklist opinion that Plaintiff had paranoia or irrational fear, (Tr. at 509); the examination notes found that he did not have any "unusual or irrational beliefs," (Tr. at 514). The impulsiveness noted on the checklist contrasts with his lethargy in the session and his statements that he did nothing all day. (Tr. at 509, 513-15.) The checklist states he had cognitive and perceptual disturbances, (Tr. at 509); the examination notes found he was not

easily distracted by bizarre or unusual internal or external stimuli, (Tr. at 514). In the checklist, he was deemed to have suicidal thoughts, (Tr. at 509), but this important bit of information did not make it into the examination notes. And Plaintiff denied such thoughts to Dr. Mills. (Tr. at 393.) Also appearing on the checklist but not in the notes were his appetite disturbances accompanied by weight gain. (Tr. at 509.) Apparently, Plaintiff had a long history of multiple physical symptoms before the age of thirty that led him to frequently take medications and that could not be explained by organic findings. (*Id.*) The source for this assertion is nowhere apparent either in her notes or the rest of the record. In the checklist, Plaintiff was deemed incoherent, (Tr. at 509); in the notes he was coherent, (Tr. at 514.) In the checklist, he had organically-based physical or psychological abnormalities, (Tr. at 509); the notes do not suggest any organic trauma linked to abnormalities. Indeed, despite a vague claim that memory problems developed after his accident, he admitted he never hit his head during that accident or was ever unconscious. (Tr. at 392.)

She also concluded he had "low IQ or reduced intellectual functioning" simply because he had only ten years of education. (Tr. at 511.) Aside from the ambiguities surrounding the extent of his education, this observation was non-responsive: the question asked her to explain her conclusion based on "specific test results." (*Id.*) No such results appear in the record and, in yet another potential inconsistency, her examination notes state his general knowledge was commensurate with his educational background. (Tr. at 515.) Further, in a similar context–addressing mental retardation listings–the Sixth Circuit has stated, "[T]his Court has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning . . . ." *Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009). Her conclusions are thus not supported by her own notes.

Moreover, Plaintiff uses this opinion to contend that he had greater than moderate limitations in concentration, persistence, and pace and that, even if only moderate, the limitations could not be accommodated by a restriction to simple, routine work. (Doc. 13 at 19-20.) Her examination notes mention various marked limitations that, if her opinion was consistent and well-supported, might lend weight to Plaintiff's argument. (Tr. at 516.) However, the inconsistencies the ALJ noted are present on this point as well. Plaintiff was not easily distracted during the session, Dr. Van Horn noted. (Tr. at 514.) Moreover, her checklist called the concentration problems "serious" but, given the context, this assertion does not show anything more than moderate problems: the "Seriously limited" category was in the middle of five severity options. (Tr. at 510.) In other words, it was a more moderate selection than the label suggests. In any case, the ALJ sufficiently explained the weight he gave to that opinion.

Moreover, the ALJ also noted Plaintiff's inconsistent statements, which also give reason to reject the need for a more stringent RFC as well as to discount his credibility. (Tr. at 28.) Regarding his concentration, none of the Function Reports he completed selected "concentration" as an area affected by his impairments. (Tr. at 257, 275, 301.) In fact, in his first Report, from February 2010, he said he had no problems following spoken instructions, he left blank whether he could follow written instructions, and he wrote ambiguously that he could follow directions for an hour or two under the question asking how he got along with authorities. (Tr. at 257-58.) His wife indicated slightly more severe problems–though she did not select the "Concentration" impairment box–but never explained why he had deteriorated since he first Report. (Tr. at 275.)

Other inconsistencies further eroded his credibility. As the ALJ noted, Plaintiff gave various answers regarding his educational background, sometimes indicating he finished high

school, and other times saying he dropped out earlier. (Tr. at 44, 368, 385, 392, 512.) The discrepancies could result from the fact that he completed at least some of his schooling outside the United States and translating his schooling level across different systems proved difficult. Yet he also said he arrived in this country at different ages, which could not as easily be explained by cultural differences. (Tr. at 385, 392.) Further, he frequently mentioned that he enjoyed playing video games and playing video games. (Tr. at 59, 252, 271.) In his most recent Report, however, he claimed he could not use the computer or read–perhaps he meant read English, but he never says that and in other places he indicated he could read English with difficulty. (Tr. at 273, 300.) Also, his first Report said he helped his children with homework, (Tr. at 252), but he denied that at the hearing. (Tr. at 61.) Plaintiff's brief contends he does not help them with homework and criticizes Defendant for asserting otherwise; he also says that contrary to Defendant's assertion, he never attended their conferences either. (Doc. 15 at 7.) Defendant made no such assertions about conferences, only observing, correctly, that he stated he helped with their homework. (Doc 14 at 14); (Doc. 15 at 7.)

The ALJ's reference to Plaintiff's lack of treatment was not improper. The Sixth Circuit has warned ALJs not to place undue reliance on this factor; but even in the case Plaintiff cites the court did not find the ALJ's analysis was erroneous because the claimant never explained how the disorder lead him to forgo treatment. *Strong*, 88 F. App'x at 846. Plaintiff here likewise does not offer any such explanation until his rather unconvincing observation in the reply brief that his PTSD and depression "are consistent with his difficulty in obtaining treatment, and Plaintiff did at least obtain an independent psychological evaluation in addition to the evaluation with the Commissioner's consulting psychologist." (Doc. 15 at 8.) Moreover, he points to his difficulty

answering questions during Dr. Van Horn's session as evidence that the disorder prevented him from seeking treatment. (*Id.*)

Again, Plaintiff employs stray observations from Dr. Van Horn's notes to come up with medical conclusions that those notes do not clearly express. Perhaps detachment and struggles responding to questions suggest that an individual is depressed and that such depression, with these symptoms, would prevent the individual from seeking treatment. But this extrapolates from the notes. It would have been better for Plaintiff's case had an expert made this statement. Or, Plaintiff himself could have offered this conclusion had it come somewhere in the record, such as in his statements to the examiners or at the hearing. Instead, Plaintiff testified that when his wife began noticing his odd behavior and recommended counseling, he complied. (Tr. at 62.) In any case, the Sixth Circuit case law counsels against using this as a determinative factor. *See Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 436 (6th Cir. 2013) (noting that the failure to seek treatment "should not be determinative in a credibility assessment"). The ALJ assembled enough additional evidence to overcome any concern that he was too preoccupied with Plaintiff's treatment gaps. The regulations required him to mention treatment in the credibility analysis and he drew plausible conclusions from this evidence.

Additionally, the ALJ bolstered his conclusion with evidence from other sources. Aside from his mental health examinations, Plaintiff did not appear to other doctors to be depressed, or to have mental health issues. (Tr. at 352-55, 357, 364, 369, 397, 400, 691, 697.) Plaintiff protests that these came from sources, like the orthopedist, who are hardly qualified to make mental health assessments. (Doc. 15 at 6.) But if they count for anything, they lend at least minimal weight to the ALJ's opinion, particularly in light of the paucity of mental health evidence Plaintiff has brought

forth. Again, there is no indication these made the biggest impression on the ALJ; he looked at other substantial evidence in the analysis.

Finally, Plaintiff's claims that the ALJ ignored his PTSD and impermissibly relied on his own observations from the hearing. (Doc. 13 at 23-24.) He is mistaken. The ALJ noted Dr. Van Horn's PTSD diagnosis and Plaintiff's traumatic childhood, then fully analyzed all of her proposed limitations and conclusions. (Tr. at 26-27.) There is no other information regarding that diagnosis the ALJ could have discussed. It was not linked to any separate conclusions from Dr. Van Horn, and it does not appear anywhere else in the record. It is hard to see what else the ALJ could have said about the diagnosis. Nor did he err by noting his own observations from the hearing. (Tr. at 28.) As with Plaintiff's other complaints, the ALJ here did no more than state, in a single sentence, he observed the Plaintiff and found he could respond to questions appropriately and participate without distraction. (*Id.*) True, the ALJ's lay opinion may prove nothing more than that Plaintiff was not a "raving maniac who needs to be locked up." *Cf. Bauer v. Astrue*, 535 F.3d 606, 608 (7th Cir. 2008) (Posner, J.) (noting that a doctor's observation that the claimant took care of her personal hygiene and shopped "is just to say that the plaintiff is not a raving maniac who needs to be locked up"). Yet, nothing suggests that the ALJ became carried away with his own powers of clinical observation. His comment came in a single line surround by other, and substantial, evidence. The Sixth Circuit prohibits the ALJ from relying "'solely'" on her own observations; she is not prevented from making them or using them. *Martin v. Sec'y of Health & Human Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984) (quoting *Weaver v. Secretary of HHS*, 722 F.2d 310, 312 (6th Cir.1983)). The ALJ did not do that here, and I suggest his analysis suffices.

**3. Conclusion**

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise

response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 2, 2015

/S PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge